# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

* * * * * * * * * * * * * * * * * * * *
| | |
|---|---|
| ANNA HITT, | |
| | No. 15-1283V |
| Petitioner, | Special Master Christian J. Moran |
| v. | Filed: July 29, 2021 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Damages, multiple sclerosis, pain, suffering and emotional distress |
| Respondent. | |

* * * * * * * * * * * * * * * * * * * *

Renee Gentry, Washington, DC, for petitioner;
Kimberly S. Davey, United States Dep't of Justice, Washington, DC, for respondent.

## DECISION AWARDING COMPENSATION[1]

Ms. Hitt established that an influenza ("flu") vaccine caused her to suffer from multiple sclerosis. Ruling, issued January 24, 2020. The parties, however, disagreed regarding the amount of compensation to which Ms. Hitt was entitled and the case proceeded to a hearing. Ms. Hitt is awarded **$469,237.53.**

---

[1] The E-Government Act, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this decision on its website (http://www.cofc.uscourts.gov/aggregator/sources/7). Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

I. <u>Facts</u>[2]

Ms. Hitt was born in 1986. Tr. 10. By 2021, she had reached the age of 35 years and had a life expectancy of 48.4 years. Exhibit L.

Before the vaccination, Ms. Hitt's health was good. Tr. 320. She competed in the javelin for a division one college athletic program. Tr. 218. After graduating from college, Ms. Hitt started nursing school. Tr. 218-19.

As part of her employment at a hospital, Ms. Hitt received a flu vaccination on October 23, 2014. Exhibit 13 at 2; Tr. 220. She experienced numbness in her legs and a physical therapist referred her to a doctor. Exhibit 8 at 5-8. The doctor, in turn, ordered an MRI.

When Ms. Hitt and her husband learned that the MRI indicated that she had multiple sclerosis, they were shocked and dismayed. Their testimony about the evening in which they learned about this diagnosis was poignant. Tr. 223-29, 320-21.

Based in part on the results of the MRI, April Erwin, a neurologist began treating Ms. Hitt. Dr. Erwin diagnosed Ms. Hitt as suffering from multiple sclerosis in December 2014. Dr. Erwin prescribed Tecfidera. Exhibit 11 at 10-11.

Multiple sclerosis ("MS") is an autoimmune disease, a non-compressive myelopathy. Tr. at 80-82. MS may be "acute and subacute and chronic," implicating multiple parts of the spinal cord. <u>Id.</u> Initially, a patient may be diagnosed with transverse myelitis, a clinically isolated syndrome recognized to be causing demyelination. Tr. 56-57. Subsequent events disseminated in time, space, and throughout the nervous system are suggestive of MS. Tr. 57-59; <u>see also</u> exhibit A-1[3], at 1 (stating "Diagnostic criteria for multiple sclerosis (MS) include clinical and paraclinical laboratory assessments emphasizing the need to demonstrate dissemination of lesions in space (DIS) and time (DIT)").

After taking Tecfidera for a period, Ms. Hitt and her husband decided to have a baby. Accordingly, Ms. Hitt paused any medications. During her

---

[2] Additional information can be found in the Ruling Finding Entitlement, issued January 24, 2020.

[3] Exhibit A-1 is Chris Polman et al., *Diagnostic Criteria for Multiple Sclerosis: 2010 Revisions to the McDonald Criteria*, 69 ANNALS OF NEUROLOGY 292 (2011).

pregnancy Ms. Hitt's multiple sclerosis was relatively calm. Ms. Hitt delivered a baby in August 2016. Tr. 31-32.

After Ms. Hitt gave birth, Dr. Erwin wanted to reinstate medications. However, Ms. Hitt wanted to breast-feed, and worried medications would complicate her baby's health. Because Ms. Hitt's MRIs were good, Dr. Erwin agreed to defer resumption of medications. See Tr. 32-33.

As a new mom, Ms. Hitt switched jobs. She stopped working as an ICU nurse and began working as a sales representative. See Exhibit 114 at 7 (summary of career). As a sales representative, Ms. Hitt visited doctor's offices. Tr. 241-242; 272.

On Monday, July 24, 2017, Ms. Hitt dropped her daughter off at daycare and then drove to a medical building in which Dr. Erwin's office was located coincidently. Ms. Hitt, as a sales representative, had an appointment to see a neurosurgeon there. Tr. 242, 243. In the reception area of the neurosurgeon's office, Ms. Hitt suffered a grand mal seizure. Ms. Hitt was taken to a local hospital. See exhibit 40 at 19. She was evaluated and released from the emergency room. Tr. 272. Later, an MRI detected a lesion in her temporal lobe. Exhibit 39 at 13.

This grand mal seizure disrupted Ms. Hitt's life for six months. Louisiana law prevented Ms. Hitt from driving a car. Consequently, she stopped working as a sales representative because she could not get to her appointments. Tr. 245. As additional precautions, Ms. Hitt could not bathe her daughter in a bathtub alone and she could not cook. Tr. 245. She missed events at her daughter's school. Tr. 325. She felt guilty for not being present at every event. Id. Not being able to get her family groceries or to drive her daughter to school left Ms. Hitt feeling dependent despite being an adult. Tr. 294.

In these six months, she began a more expensive and aggressive MS treatment protocol. Due to the treatment plan, she had to stop breastfeeding, "the one thing that came naturally and easily to [her] as a mother". Exhibit 101 at 2. Ms. Hitt had another MRI on September 29, 2017. Exhibit 97 at 89-90. Her husband reported that her anxiety levels picked up during the weeks and days prior to MRIs. Tr. 326.

Once those six months past and Ms. Hitt did not experience more seizures, her life returned to "normal," a term that encompasses having multiple sclerosis. She started a job working part-time as a nurse, caring for patients with heart

conditions.[4]  Ms. Hitt traveled by plane for vacations.  She and her family also took trips to the mountains and beaches.  Exhibit 101 (affidavit) ¶ 2; Tr. 289; Tr. 330.

Ms. Hitt has continued to see Dr. Erwin.  According to Dr. Erwin, Dr. Erwin has treated Ms. Hitt's multiple sclerosis aggressively.  In spring 2018, Ms. Hitt began taking a new medication, Lemtrada.  Exhibit 39 at 10, 25; exhibit 97 at 54; Tr. 236.  The first course of Lemtrada is administered by IV over five days.  During this infusion, Ms. Hitt felt bloated and distended.  Tr. 249.

According to information Ms. Hitt relayed from Dr. Erwin, Lemtrada attempts to reset the body's immune system.  Tr. 248.  Specifically, Lemtrada suppresses production of T cells, which target viruses.  Thus, while Lemtrada might prevent the body from attacking itself (and causing a multiple sclerosis flare), Lemtrada also makes a person vulnerable to outside infections.  Ms. Hitt was prescribed Valtrex prophylactically to prevent herpes.  For a few months while Ms. Hitt's T cells were increasing, she had to take additional steps to protect herself.  She was encouraged to stay home to minimize exposure to potentially sick people.  Tr. 250-51, 272, 324.  When Ms. Hitt did leave the house, she wore a mask.[5]  When her daughter developed hand, foot, and mouth disease, Ms. Hitt could not care for her.  Tr. 252, 293.

While the depletion of Ms. Hitt's immune system due to Lemtrada was temporary, Lemtrada also caused another side effect.  Ms. Hitt's thyroid levels first became very elevated, then very decreased.[6]  Tr. 256-57.  An endocrinologist diagnosed Ms. Hitt with Hashimoto's thyroiditis.  For this problem, Ms. Hitt will take a pill for the remainder of her life.  Tr. 256, 263, 294.

The thyroid trouble, in turn, has complicated efforts for Ms. Hitt and her husband to expand their family.  Ms. Hitt has consulted a fertility specialist, although she did not produce any medical records from this doctor.

Since the official diagnosis of multiple sclerosis in December 2014 through Ms. Hitt's testimony at the May 20, 2021 hearing, she has experienced little physical pain.  Tr. 298, 331.  Her multiple sclerosis presented with numbness and even this symptom has dissipated.  She has retained her ability to walk and to

---

[4] The Corona virus pandemic caused some changes in Ms. Hitt's job.

[5] Ms. Hitt took these precautions in 2018, two years before the Corona virus pandemic.  One of her friends joked Ms. Hitt was quarantining before it was cool.  Tr. 251.

[6] The Secretary agreed that Lemtrada can cause thyroid problems.  Tr. 351.

perform activities of daily living.  She is working part-time in a job she loves.  Tr. 282.  She tries to emphasize what she can do, not her limitations.  Ms. Hitt exercises as a way to respond to stress.  Tr. 313.

Nevertheless, suffering multiple sclerosis worries her, at least occasionally.  A concrete fear is that the events of July 24, 2017 will repeat but less fortuitously.  Ms. Hitt could have a seizure while she is driving, and the results could be "catastrophic."  Tr. 324; accord Tr. 245-46, 295.

Apparently minor health problems alarm Ms. Hitt.  For example, she has feared that a decrease in her visual acuity is not typical age-related degeneration but actually a herald of optic neuritis due to multiple sclerosis.  Likewise, even a headache makes Ms. Hitt wonder whether it is just a "headache."  Tr. 237, 284.  A constant shadow or veil floats over her life.  Tr. 260, 262, 326.

Ms. Hitt assessed her level of anxiety over the month preceding the hearing as a 7-8/10.  Tr. 299; see also Tr. 332 (Mr. Hitt rated the anxiety as 8-9).  This level reflected preparation to testifying, a process that entailed reviewing events about which Ms. Hitt would prefer not to dwell.  When the litigation is removed, Ms. Hitt still experiences anxiety.  Tr. 299-300.  She described multiple sclerosis as a "sleeping beast."  Tr. 300.

To respond to the anxiety, Ms. Hitt exercises.  Tr. 297, 329.  Her faith and church community comfort her.  Tr. 291.  Ms. Hitt has visited a mental health counselor (Tr. 314, 333), but no medical records were filed.

## II. Procedural History

Ms. Hitt filed her petition on October 29, 2015, claiming a flu vaccine caused her to suffer from TM and then MS.  The Secretary filed his Rule 4 Report on February 29, 2016.  Both parties retained experts and filed multiple reports.  Subsequently, the parties were directed to file briefs.

An entitlement hearing was held on April 17, 2018.  Following the hearing, the parties discussed informal resolution for many months.  The parties did not agree to resolve the case and suggested a schedule for submission of briefs.  After submitting their briefs, the undersigned resolved the question of entitlement, ruling in favor of Ms. Hitt on January 24, 2020.  The case proceeded into the damages phase.  Order, issued Jan. 28, 2020.

Over the next several months, Ms. Hitt filed additional documentation showing medical expenses and hospital visits.  However, efforts were somewhat

delayed by the pandemic. On September 18, 2020, Ms. Hitt filed a status report discussing her damages proposal. Ms. Hitt continued to search for and submitted more records. She filed her final damages proposal on March 8, 2021.

On April 22, 2021, respondent filed his brief on pain and suffering. Ms. Hitt then filed her pain and suffering brief on May 3, 2021. With these filings, the parties proceeded to a damages hearing on May 20, 2021.

This matter is now ripe for adjudication.

### III. Standards for Adjudication

Petitioners bear the burden of establishing elements of compensation by a preponderance of the evidence. 42 U.S.C. § 300aa–13(a). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

### IV. Analysis

Ms. Hitt's request for compensation includes four components. These are discussed below.

#### A. Lost Earnings

Ms. Hitt proposed $106,174.37. Exhibit 114 at 8. The Secretary accepted the basic calculations and reduced for taxes, leaving $79,064.95. Resp't's Supp'l Br., filed March 29, 2021, at 2; exhibit I. Ms. Hitt agreed to this proposal during an April 14, 2021 status conference; see also Tr. 218. Thus, Ms. Hitt is awarded $79,064.95 in lost earnings.

#### B. Unreimbursed Expenses – Past

Ms. Hitt proposed $14,529.28. Exhibits 114-15. The Secretary accepted $13,633.93. Resp't's Supp'l Br., filed March 29, 2021, at 2. The difference was that the Secretary rejected some invoices due to a lack of documentation that the bills were paid.

In her oral testimony, Ms. Hitt stated she paid those invoices. She also testified about efforts to obtain documentation of payment. Tr. 214-18. Although the Secretary cross-examined Ms. Hitt, the Secretary did not ask any questions on

this point.  See Tr. 269-75.  Accordingly, Ms. Hitt is awarded $14,529.28 in past unreimbursed medical expenses.[7]

### C.     Unreimbursed Expenses – Future

Ms. Hitt receives benefits from a health insurance plan her husband's employer offers.  Under this policy, Ms. Hitt must pay a deductible of $500 per year initially.  After Ms. Hitt pays that deductible, the insurance company reimburses medical expenses at a certain percentage until Ms. Hitt pays a maximum of $3,500 per year.  Ms. Hitt's payment of $500 counts towards the maximum payment.

The parties agree Ms. Hitt requires annual appointments with her neurologist and MRI scans to monitor her multiple sclerosis.  Ms. Hitt is likely to need medications.  Accordingly, the parties agreed that $3,500 per year is an appropriate amount for one aspect of future unreimbursed medical expenses.  Resp't's Obj., filed May 24, 2021.

Ms. Hitt also requests reimbursement for mileage expenses.  She estimated that she drives 500 miles per year.  Exhibit 114 at 3.  At the IRS allowed rate of 17 cents per mile, Ms. Hitt's annual expense is $85.

The component of future unreimbursed medical expenses must be reduced to net present value.  42 U.S.C. § 300aa–15(f)(4).

### D.     Pain and Suffering and Emotional Distress

The Vaccine Act states that compensation shall include "(4) For actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000."  42 U.S.C. § 300aa–15(a).

Factors relevant to this element of compensation are "[(1)] the ability to understand the injury, i.e., the injured's mental faculties are intact; [(2)] the degree of severity of the injury; and [(3)] the potential number of years the individual is subjected to the injury."  McAllister v. Sec'y of Health & Human Servs., No. 91-

---

[7] Whether testimony via an affidavit, which is not subject to cross-examination, would constitute preponderate evidence that bills were paid is not presented here.  Ms. Hitt appeared truthful in her oral testimony.  See Andreu v. Sec'y of Health and Human Servs., 569 F.3d 1367, 1379 (2009) (explaining that trial courts make credibility determinations in order to assess the candor of fact witnesses).

1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated and remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995).

This section of the Vaccine Act recognizes three components: "pain and suffering and emotional distress." A basic tenet of statutory interpretation is to construe the meaning of a statute so that each part has meaning. See Calendria v. U.S., 5 Cl.Ct. 266 (1984) (stating that "each section or part of a particular statute must be construed in relation to each other section or part 'so as to produce a harmonious whole.'") (citing 2A Sutherland, Statutes and Statutory Construction § 46.05, at 56 (C. Sands rev. ed. 1973)); see also Flowers v. Sec'y of Health and Human Servs., 49 F.3d 1558, 1560 (1995) ("[o]ur statutory interpretation begins with the language of the statute itself, which must be ordinarily regarded as conclusive absent a clearly expressive legislative intent to the contrary.").

While the terms "pain" "suffering," and "emotional distress" connote similar concepts, they are not identical. To understand the meaning of these terms, consulting a dictionary is permitted. See Hervey v. Sec'y of Health & Human Servs., 88 F.3d 1001, 1002 (Fed.Cir.1996) (using dictionary to define a term in the Vaccine Act). "Pain" is defined as "2 a: usu. localized physical suffering associated with a bodily disorder. WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 846 (1986).[8] Next, "suffer" means "to be subject to disability or handicap." Id. at 1179.[9] Finally, "distress" means "2 a: pain or suffering affecting the body, a bodily part, or the mind . . . b. a painful situation." Id. at 368. This dictionary further explains "distress implies an external and usu. temporary cause of great physical or mental strain and stress" and "suffering implies conscious endurance of pain or distress." Id.

### 1. Actual Pain and Suffering and Emotional Distress

The parties value this element differently. Ms. Hitt contends that her past pain, suffering, and emotional distress warrant compensation more than $250,000. Thus, petitioner contends she is entitled to the maximum award even without considering any future pain and suffering and emotional distress. Pet'r's Br., filed May 3, 2021. In contrast, the Secretary maintains a reasonable amount of compensation for Ms. Hitt's past pain and suffering is $100,000. The Secretary further recommends that the value of Ms. Hitt's future pain and suffering is

---

[8] A secondary definition of "pain" is: "b: acute mental or emotional distress or suffering."

[9] Other definitions of "suffer" include: "1: to endure death, pain, or distress 2: to sustain loss or damage."

$1,033.06 per year for the remainder of her life expectancy. This works out to $50,000 which, after reduction to net present value, equates to $35,899.55. Resp't's Br. filed April 22, 2021; exhibit K.

Ms. Hitt's case is unusual in two respects. First, relatively few cases have discussed non-economic damages for multiple sclerosis. Ms. Hitt cited some cases, which resolved via a stipulation. Pet'r's Br., filed May 3, 2021, at 4-5, citing Halcrow v. Sec'y of Health and Human Servs., No. 16-212V (Fed. Cl. Spec. Mstr. June 3, 2020), and Giordano v. Sec'y of Health and Human Servs., No. 13-277V (Fed. Cl. Spec. Mstr. May 28, 2019), among other cases. But, as the Secretary pointed out, the decisions contain nearly no facts, making comparison challenging. Independent research has turned up relatively few cases. See Jay Zitter, Annotation, *Excessiveness or adequacy of damages awarded for injuries to nerves or nervous system*, 51 A.L.R. 5th 467, § 14 (1997); cf. SGS-92-X003 v. United States, 118 Fed. Cl. 492, 532 (2014) (declining to award emotional distress damages to plaintiff who suffered emotional distress in a breach of contract case). Second, Ms. Hitt's multiple sclerosis has caused her little pain. The Secretary emphasizes the relatively mild course of Ms. Hitt's multiple sclerosis so far. Resp't's Br., filed April 22, 2021, at 2. On the other hand, Ms. Hitt maintains she has endured "pain, suffering, and exhaustion for nearly 7 years." Pet'r's Br., filed May 3, 2021, at 9.

Of the three terms Congress listed in the Vaccine Act, "pain, suffering, and emotional distress," "pain" is perhaps the easiest to understand. As stated above, "pain" can be linked to the physical suffering associated with a bodily disorder. While the dictionary's definition of "pain" is broad enough to include pain associated with mental distress (see footnote 8, above), the statutory terms (suffering and emotional distress) encompass that aspect more directly. Thus, the focus here is Ms. Hitt's physical pain. While the pain has, at times, been minimal and even nonexistent, Ms. Hitt has experienced some pain. A reasonable amount of compensation is $5,000.

The remaining two terms in the Vaccine Act "suffering" and "emotional distress" are more difficult concepts to parse. But, both flow from the mental (as opposed to physical) toil an injury causes. As indicated above, "suffering" can encompass the sensation of being "subject to disability or handicap" as well as the "conscious endurance of pain or distress." WEBSTER'S at 1179 and 368.

Here, by this understanding, Ms. Hitt has suffered greatly. The primary part of compensation should reflect Ms. Hitt's suffering in being diagnosed with a chronic condition. Multiple sclerosis is not curable. Neither an operation nor

physical therapy nor the body's innate healing processes will cure Ms. Hitt of multiple sclerosis. Regardless of whether her multiple sclerosis stays relatively dormant, multiple sclerosis never entirely vanishes. It will remain a "disability" throughout her life.

Before multiple sclerosis, Ms. Hitt was not concerned about the future. Tr. 320; see also exhibit 14 (affidavit, dated Nov. 23, 2015).[10] After receiving the diagnosis of multiple sclerosis, she has been and remains much more worried about the future.

In the undersigned's discretion, the development of a chronic condition like multiple sclerosis warrants a relatively large amount of compensation. The chronicity of multiple sclerosis distinguishes it from acute problems such as Guillain-Barré syndrome for which a good recovery can be expected. While a Guillain-Barré patient might have different degrees of residual problems, including paralysis in extreme cases, a person who suffered Guillain-Barré syndrome does not usually fear a relapse. Multiple sclerosis can bring about – and in Ms. Hitt's case did bring about – a change in outlook. Tr. 266 (Ms. Hitt's testimony comparing a shift in outlook to the changes after Hurricane Katrina). The same can also be said for Hashimoto's thyroiditis but on a lesser scale. While Hashimoto's thyroiditis is permanent, it is controlled with medication. For Ms. Hitt, a reasonable amount of compensation for the emotional distress associated with being diagnosed with multiple sclerosis and Hashimoto's thyroiditis is $175,000. ($150,000 for multiple sclerosis plus $25,000 for Hashimoto's thyroiditis).

The remaining term of the relief authorized in section 15(a)(4) is emotional distress. In the approximately 6.5 years since Ms. Hitt was diagnosed, she has had a series of episodes that at least temporarily brought about pain in her mind. Ms. Hitt experienced emotional distress following multiple events, including experiencing a seizure, losing a driver's license for six months which caused the loss of employment, depending upon others for basic chores like bathing her baby and cooking, and enduring various tests such as MRIs. To a smaller degree, Ms. Hitt also had emotional distress when her thyroid levels were abnormally high and then abnormally low. A reasonable amount of compensation for this emotional distress is $30,000.

---

[10] Ms. Hitt also recognizes that she was aware that anyone's life could turn on a moment even without multiple sclerosis. Tr. 262.

10

Accordingly, a reasonable amount of compensation for Ms. Hitt's "actual… pain and suffering and emotional distress" (section 15(a)(4)) is $210,000. This figure, as explained, derives from the evidence in Ms. Hitt's case.[11]

### 2. Future Pain, Suffering, and Emotional Distress

Because of the award for actual pain suffering and emotional distress does not exceed the statutory limit, Ms. Hitt is eligible for an award of "projected pain and suffering and emotional distress." 42 U.S.C. § 300aa–15(a)(4); see also Graves v. Sec'y of Health & Human Servs., 109 Fed. Cl. 579, 587 (2013). Ms. Hitt's submission on this topic was not helpful. Because she contended that her actual pain and suffering and emotional distress exceeded $250,000, she presented no alternative argument for projected compensation. See Pet'r's Br., filed May 3, 2021. On the other hand, the Secretary made a concrete proposal. Resp't's Supp'l Br., filed April 22, 2021, at 3.

The Secretary contended the activities for which an award of projected pain and suffering and emotional distress should include Ms. Hitt's anxiety about having MRI scans and the inconveniences associated with yearly doctors' appointments. Tr. 346 (Respondent's counsel), see also Tr. 300-11 (testimony about anxiety), 322 (testimony about anxiety).

The Secretary further argued that the chance of a relapse should not factor into an award of future pain, suffering, and emotional distress. On this question, the Secretary's position is well-founded. Ms. Hitt presented very little evidence about the likelihood of a relapse. For example, Ms. Hitt did not submit any articles about how often multiple sclerosis relapses. She likewise did not present a report from a specially retained expert in multiple sclerosis, such as Dr. Tornatore who testified on her behalf in the entitlement hearing. The most relevant piece of evidence was a short, handwritten statement from Dr. Erwin, Ms. Hitt's treating neurologist. Dr. Erwin stated the future is "unpredictable." Exhibit 109 at 1. A

---

[11] Coincidently, the amount awarded here seems to align with the cases Ms. Hitt cited. To the extent the award to Ms. Hitt exceeds the awards in those other cases, the increased award is justified for two reasons. First, those cases were decided in 2007-11. Everything else being equal, inflation means that the awards in those cases should be increased. Second, those cases were resolved on the basis of compromises. The choice of other petitioners to compromise their claim, that is to accept a lower amount of compensation in exchange for an expedited recovery, does not reduce the value of Ms. Hitt's case.

11

statement of such uncertainty does not carry Ms. Hitt's burden of presenting preponderant evidence that she is likely to suffer a relapse.

In the future, Ms. Hitt is not likely to endure the emotional distress associated with receiving a new diagnosis of a chronic disease. Ms. Hitt seems to have resolved to keep a positive attitude, minimizing any emotional distress. Tr. 246, 262.

Without any persuasive evidence that Ms. Hitt's condition will worsen, the undersigned finds that Ms. Hitt's multiple sclerosis is likely to remain as it has been for the past few years – "stable." Exhibit 109 (Dr. Erwin's statement); accord Tr. 273-74, 283. Ms. Hitt's recent condition has been relatively pain free. Tr. 298.

But, as the Secretary acknowledged, the absence of physical pain does not necessarily mean the absence of emotional suffering. Ms. Hitt persuasively and powerfully explained how a potentially typical and minor health issue can produce intense anxiety about whether the "sleeping beast" is awakening.

To account for all these factors, a reasonable amount of compensation for projected pain, suffering, and emotional distress is $2500 per year. This amount, in turn must be reduced to net present value.

### E.    Summary

| Item | Current Value |
|---|---|
| Lost Earnings | $79,064.95 |
| Unreimbursed Medical Expenses | $14,529.28 |
| **Total for Past (excluding pain, suffering and emotional distress)** | **$93,594.23** |

**FUTURE**

| Item | Annual Award | Present Value |
|---|---|---|
| Unreimbursed Medical Expenses | $3,585.00 | **$125,643.30** |

**PAIN, SUFFERING AND EMOTIONAL DISTRESS**

| Item | Annual Award | Present Value |
|---|---|---|
| Past Emotional Distress | | $175,000.00 |
| Past Suffering | | $30,000.00 |
| Past Pain | | $5,000.00 |

12

| | | |
|---|---|---|
| Pain, suffering and emotional distress | $2,500.00 | $87,617.36 |
| Total for Pain, Suffering and Emotional Distress | | $297,617.36 |
| Statutory Cap | | **$250,000.00** |
| | | |
| Total Compensation | | **$469,237.53** |

## V.     Conclusion

Earlier in this litigation, Ms. Hitt established that she was entitled to compensation.  The evidence now shows that a Ms. Hitt is entitled to compensation in the amount of **$469,237.53** to be issued in the form of a check payable to petitioner.  This amount reflects $250,000 for pain, suffering, and emotional distress; $93,594.23 for past unreimbursed expenses, consisting of $79,064.95 in lost earnings and $14,529.28 in unreimbursed medical expenses; and $125,643.30 as the present value of future unreimbursed expenses.

The Clerk's Office is instructed to enter judgment in accord with this decision unless a motion for review is filed.  Information about the submission for a motion for review, including deadlines, is presented in the Vaccine Rules, which are available through the Court's website.

**IT IS SO ORDERED**.

s/Christian J. Moran
Christian J. Moran
Special Master
